Next case, CHECKERS CAB OPERATORS, versus MIAMI-DADE COUNTY. Next case, CHECKERS CAB OPERATORS, versus MIAMI-DADE COUNTY. Good morning, Your Honors. May it please the Court? Good morning, Mr. Anderson. I'm Ralph Anderson, and I represent the appellants in this case. With me at counsel table is the other Ralph, Ralph Patino, who's trial counsel in this case. And I apologize in advance. I seem to be losing my voice. We can hear you fine. You're doing just fine.  The issue before the Court today is whether the District Court properly dismissed, with prejudice, the appellants, my client's claim against MIAMI-DADE COUNTY. There were two claims that are involved in this appeal. A takings claim under the federal and Florida constitutions, and also an equal protection claim under those same constitutions. The judge in this case found that there was no protectable property interest insofar as the value of the medallions, which are held by my clients, or also as to the exclusivity of the provision of for hire taxi cab services in MIAMI-DADE COUNTY. I think it's important to just give a little bit of background, and I know the Court's familiar with the facts. We're familiar with the background. Let me ask you a question about the Fifth Amendment takings claim. I've looked at the cases that are cited in your brief. I cannot find a case that would support the proposition that increased competition in a market is a taking. The city can always add more medallions, right? The city can add more medallions, but as . . . Your clients get to keep their medallions, right? Yes, they get to keep their medallions. Can you cite any case that would support the proposition that in a market, increased competition in a market in this context would constitute a Fifth Amendment taking? I don't have a case that says that, Your Honor, but what we have is the judicial landscape beginning with the Ruckelshaus case, which we rely upon heavily. What the courts have held is that in a takings analysis, you need to have an ad hoc factual determination. You have to look at all the circumstances. There is no, quote, set formula in the takings analysis, and what we have in our case is from 1998 until this ordinance was enacted, there was exclusivity for for hire transportation in Miami-Dade County was reserved to medallion holders, for sure. You don't have a constitutional right to exclude others from the market, do you? It depends on what the factual circumstances are. In this case, Judge, you've had a code provision that explicitly declares, and this is different from any case that's cited by my opponents in this case. We have a code provision that explicitly declares that a taxicab medallion is deemed to be, quote, unquote, intangible property. Now, what that means, I'm sorry, Judge? The fact that it is property is separate and different from whether you're entitled to the protection of the specific value in the context of they continue to have the right to the medallion and to operate the service. All that's happened is that other people also have that right. So it hasn't been taken from you. What they have done is add it to others. How is that a taking as to you? It's a taking as to us because prior to the enactment of this statute, you had to have a medallion to provide the transportation services that my clients provide and that TNCs now provide after the statute. Under the code, new medallions were issued very infrequently. Did the code give you the exclusive right to compete in the market? The code limited. And if it did, show me where. I've read it. I can't find it. I think it's undisputed that prior to May 2016, you could not operate.  Well, the county can do that. But our position is that because our position is that we had a protected property interest in that exclusive. You may have had a protected property interest. The question is how far it extends. Let me ask the question this way. You concede that the county could double the number of medallions or triple the number of medallions issued in a year based on its view that the people of Miami-Dade County, the tourists, are not getting properly served. You couldn't walk into court and say that amounted to an unlawful takings on the Fifth Amendment, right? Well, under the code as it existed prior to this amendment, there were specific provisions as to.  Could the county double the number of medallions if it chose to do so based on its view of the need in the community? Without you being able to walk in and say that constituted an unlawful taking. I would say, Your Honor, that that act by the county would violate the code. How do you respond to the cases that look at businesses like taxicab businesses and say that the holder of a license in an industry like that that is a heavily regulated industry understands and recognizes that the government always has the right to change those regulations? My answer to that, Your Honor, is we need to look at the history and the facts in this case. Number one, since 1998, for hire transportation was limited to medallion holders. Number two, the issuance of new medallions was severely restricted. Number three, under the code and under the common practice in Miami-Dade County, these medallions were alienable. They were assignable. Let me come back to my question. You said the code barred the county from issuing more medallions? I'm not saying the code barred it. The county explicitly reserved the right to authorize additional for hire licenses with such modifications or upon such terms and conditions. I'm reading from it. As in its judgment, as in its judgment, the public convenience and necessity may require. And pursuant to that power, the county issued more than 300 additional medallions since 1998. Isn't that true? It is true. And if you look at the facts that surround that, that means prior to the statute being enacted in 2016, 18 years had passed during that. Right, but I guess what I'm asking to cut to the chase is that the county decided to issue not 300 more medallions, but 600 more medallions. Your inchoate property rights in medallions didn't bar the county from doing that, did it? I'm just talking about medallions now. I understand, Your Honor. I can't really answer that question because I think that you have to look, before the county can do something along the lines of what Your Honor suggested, you need to look at the whole thing. I read from the specific ordinance itself. They reserved the right to issue more medallions if they determined it was necessary. I'm simply asking whether you would have a takings claim if instead of issuing 300 medallions, they issued 600 or 900 since 1998 over the last 21 years. Could they do that without violating the Fifth Amendment takings clause? I think they could not, Judge. Please, just explain to me why they could not do that. The text of the ordinance wouldn't preclude them from doing that, right? The whole factual circumstances, we believe, would preclude them, including the fact that the secondary market that was created here was nurtured by the county and it itself took advantage of that by auctioning off medallions in 2012 for $400,000 apiece. There are also county commissioners that went on record, this is alleged in our complaint, that assured the medallion holders that they have a protected property interest in their medallions and the exclusivity is what we're arguing about. We think that you need to see all of the facts and circumstances to look at the combination. That's what we believe that the Ruckelshaus case stands for and the other cases that we cite in our initial brief. It's an ad hoc analysis that looks at everything, not just one particular code provision, but all of the facts that surround it. Let me ask you a slightly different question. Let's say I own a piece of property, real property, and it is very high value because the zoning of the property next door is very restricted and the government decides to alter the zoning of the property next door and now people can do whatever they want with it. They've done nothing to me, but the value of my property has just plummeted because this property next door is available. That's not a taking to me, is it? That may or may not be, but the difference is that in our case, we have the county closely enmeshed with the medallion system for decades and then all of a sudden they give in to political pressure or, if you want, the inertia of the digital age and legalize these companies. There has been reasonable investment-backed expectations, in our opinion, to the continued viability of the medallion system for taxicab transportation in the county. So when you're saying that they're closely enmeshed with it, you're essentially agreeing that this was a heavily regulated industry? I can't dispute that, Your Honor, but just because it's heavily regulated doesn't mean that the county or any other governmental entity has carte blanche to do away with reasonable investment-backed expectations. For 20 years, the provision of four-hour transportation was— the only way you could lawfully do it was with a taxicab medallion. The medallion system flourished, was nurtured and encouraged by the county, taken advantage of by itself monetarily and profited handsomely from it. Your time is almost up. Do you want to address your equal protection? I will rest on my briefs on that. Before we move on, and we'll give you all the time that you've reserved for rebuttal, I need some more help on this, takings. As I understand it, takings can occur in one of three ways, as I see the law. First, the plaintiff may assert the government required him to suffer a permanent physical invasion of property. You don't have that. Second, a plaintiff may assert that a particular regulation deprived him of all economically beneficial use of the property. Seems to me you don't have that and you don't plead that. What you say is we still had some value in it, but they diminished the fair market value of the medallion. Substantially. So it seems to me the real claim you have, if you have a claim at all, is the third theory that a plaintiff may assert a partial regulatory taking which governs the framework of this case. Is that what essentially you're arguing? Yes. Okay. Now, the critical case the Supreme Court has decided there is Penn Central dealing with takings. And they say we look at three things, the economic impact, the extent to which the regulation has interfered with an investment-backed expectation, and the character of the invasion itself. The claim here, just so I have it, is not that they destroyed the value, but they substantially reduced the value of the medallion. Is that essentially what we're talking about? Yes. That's the beginning and the end of the takings claim. Well, I don't know. Well, is there anything more to it? Maybe I've missed it. I've tried to lay out the parameters of how you would come at a takings claim. Admittedly, the first two prongs don't affect you at all. Well, actually, Your Honor quoted three prongs. Yes. And if I'm correct, those three prongs, I know I have them here somewhere, but here, the character of the governmental action, two, its economic impact, and three, its interference with reasonable investment-backed expectation. We have problems with number two and three, the economic impact. You do not have to have a valid takings claim. You do not need to show that your property is valueless. If it is substantially diminished, that is sufficient. There's no question that there has been a huge economic impact here, and I don't think the county disputes that. Of course, the problem is even in looking in the area of real property, the court has recognized the government may create and execute laws that adversely affect recognized economic values. They approve zoning laws that, quote, may destroy or adversely affect the recognized real property interest, so long as those changes are dictated by health, safety, general welfare, basically police power. The problem you have here is that you're really seeking to bar competition in the area from a different form, but we'll give you the full. Let me ask you a question before you. And this isn't really necessary to decide the case, but how would you establish your damages in this case? Well, that is an interesting question because of the Florida statute that was enacted last year. I mean, that's why I'm asking. Could we say that this appeal is moot? No, Your Honor, and first off, the county does not claim that it's moot. That's not dispositive, but as we cited in our brief, where there's claim for money damages, the mootness doctrine does not apply under these circumstances. How would you prove your damages? Well, at the very least, and please, I don't want to commit to this because it hasn't been briefed or argued, but at the very least, the diminution of medallion value from the time that the T&E ordinance was enacted in May 2016 through and including the time, the effective date of the Florida statute, which is July of the following year. How would you prove that? I'm sure that we could find experts that would be able to prove that. Okay, thank you. Thank you. Thank you. Good morning, Your Honors. Aneri Pulgar-Alfonso for Miami-Dade County. With me at counsel's table is Gerald Sanchez and Bruce Lebeber, both assistant county attorneys. The court, I think, has touched upon the crucial issue in this case, and I'll focus my argument, at least the beginning part of it, on the takings claim. Since 1998, the taxicab industry has had a property right, and that property right has been limited to the individual licenses, the right to operate with that license and the right to exclude others from operating that individual license. The issue that has been raised by this case is that plaintiffs would like to exclude an entire industry from the transportation market, and since 1998, the county has been clear. It has amended the taxicab ordinance at least 33 times. It has added at least 300 new medallions, and it's been clear that there has been no . . . Record? Yes, sir. So there . . . Well, are you saying that the taxicab driver's business has increased? We have added medallions, and arguably the need for the T&E is because there's additional need in the market for additional services. What's the value of a medallion in Dade County? Your Honor, I don't have that number. All right. Let me ask you a question in respect to that. Accepting that you can increase the number of medallions that you issue and that you've increased it by a number of 300 since 1998, would the county have it within its power to triple or quadruple the number of medallions if it chose to do so if the net result or net effect of that was to render the value of the medallion virtually worthless? Yes, Your Honor. I think the ordinance is clear that there's no expectation that the number of medallions would be capped at any point and that the county could . . . So by regulation, they could completely wipe out the value of the medallion? Well, Your Honor, the county has never promised a value for its medallion. I didn't say they did promise. I'm just asking with respect to a Fifth Amendment takings case whether in the course of exercising your regulatory power, you could go so far as to render nugatory the value of the medallion simply by exponentially increasing the number that you issue. Well, there would still be value because those medallion holders would still be able to operate in the industry. And so the county can add medallions as it sees the need. And in this case, even though . . . The answer is yes. Yes, Your Honor. The fair market value had been at one point in this record $400,000, let's say. I'm not sure that the county would agree with that, that there was an auction . . . You auctioned them off at $400,000 at one point. That is what the market . . . Maybe there was something in the record that said as of 2014 it had a fair market value of $240,000. Am I right about my recollection there? That may be right. Suppose I'm asking the question. Suppose they were to so regulate this industry as to effectively render worthless a medallion. They would turn around and say, anybody who wants it can get it. We have only one requirement. You've got to have a chauffeur's license or something like that, and we're going to increase exponentially the number, thereby rendering worthless. I don't say that's what you have here. I'm asking a different question. Could you do that without running afoul of the takings clause? Your Honor, I . . . Concede they did own property. There is a property right. The right is limited. I just want to know whether in the course of a heavily regulated industry you could wipe out the value completely without running afoul of the Fifth Amendment. Your Honor, I think the cases in the Eighth Circuit decision in Minneapolis and the Seventh Circuit decision in the city of Milwaukee are instructive here. In both those cases, the cap of the number of licenses was removed, and the courts in those cases simply held that there was no expectation in that not happening because it's a heavily regulated industry. Those are license cases, though, right, which is different from what we have in this case. We have the Miami Ordinance, which says that the medallions constitute intangible property. That makes this case a little different than the other cases, doesn't it? Your Honor, yes, but in this case, they remain . . . the property at issue here is . . . taking it back, the property at issue really is the right to operate your medallion and the right to lease your medallion. And so even if there is no limit on the number of medallions that we can issue, which is the case and has been the case since 1998, these medallion owners continue to have that property. And so what they're . . . But I'm simply asking whether they can wipe out the fair market value of that property completely simply by issuing an unlimited number of medallions. And your answer is, yeah, they can do that. I think it would depend on the circumstances. If there's still a market where additional . . . even if there was no . . . you can get as many as you want. If there's still a need, then I think it still has a value. So it would depend on the circumstances. It certainly wouldn't be the same value, but if there's still a need . . . And so it's supply and demand. So the bottom line is they can regulate it so fully as to render it worthless. I don't think that that would be the result. That isn't my question. I'm not asking a pragmatic question. I'm not asking you to tell me about the forces of supply and demand. I'm asking you to assume for the purposes of my question that they set about a course to just flood the market with medallions, thereby rendering the medallions virtually worthless. Could they do that without running afoul of the Fifth Amendment takings clause? See, I thought your answer would be maybe yes, maybe no, but that's nothing remotely like what we have here. That is the case, Your Honor. That is the case. I think it would depend on the circumstances. But at some point, the regulation can render the value of their property worthless. Your Honor, I would advise the court of the Fifth Circuit case in Dennis Mellicon v. City of New Orleans where there was extensive regulation of the taxicab industry there. And the court found that given the history of extensive regulation, the expectation that you would continue to be subject to extensive regulation, that there would be no regulatory taking in that circumstance. And so in this case, I think it's a similar scenario. So the answer to the question would be if you increase the number of medallions to the point that you made them worthless, that would still not constitute a Fifth Amendment taking? Well, I think that the plaintiffs in this case could never have an expectation that that would never happen. From the very beginning, it was clear that the county could add medallions however many the county would see fit. So essentially, once they buy the medallion, they're at the mercy of the county? Well, of the market, Your Honor. No, no, I'm not talking about the market now. I'm talking about whether the county, for reasons having nothing to do with the forces of supply and demand, chooses to exponentially increase the number. The county could choose to exponentially increase the number. I mean, they reached the conclusion that they've too heavily regulated this industry. There are a lot of tourists. There are 10 million tourists who come to Miami-Dade County in a year. They're getting lots of complaints from tourists. They can't get cabs when they want them, particularly when it's raining. And so they decide that they're going to open the market up completely. They're not going to regulate much at all. They'll require some minimal check on who the chauffeur is and so on. But they come at it with the very purpose of exponentially increasing it. These folks bought these medallions for $200,000, $400,000, whatever the case may be. The pleading, the complaint says what happened here is they reduced in a measurable way the fair market value of our property. I'm simply asking you whether they can reduce it to virtually nothing without running afoul of the takings clause, and I think your answer is yes. Yes, Your Honor. Okay. Did we look at the Miami ordinance and determine after reading it that the language in the ordinance gives the medallion owners exclusive operating rights in the transportation industry? It gives the owner the exclusive right to operate their own individual medallion. The for hire industry in Miami-Dade County is not limited to taxi cabs. We have limousines, motor carrier vehicles, other forms of transportation. And so what we did in 2016 is simply add an additional form of transportation. Taxi cabs have not and haven't ever been the only exclusive form of transportation. We're here at the pleading stage, right? The court granted the motion to dismiss. And so I guess what I'm trying to figure out is could there be evidence later that the district court could take into consideration that would establish that they had exclusive rights in the transportation industry in Miami-Dade and you're saying there's no way we can read the ordinance that way? No, Your Honor. And if you look at the Miami-Dade County Code, which this court can take judicial notice of, just as the district court did this, it's the law. In Miami-Dade County, there are other forms of for hire transportation. And the plaintiffs have conceded to the fact that, for example, in 2016, we adopted the taxi cab ordinance, the transportation network entity ordinance, and we also adopted the limousine ordinance. And I would point the court's attention to in the past, there have been similar challenges between the taxi cab and limousine ordinances. So the for hire industry in Miami-Dade County has never been exclusively taxi cabs. And so it would be inappropriate to remand this case for further factual findings when really this is truly just a legal question. Well, help me with the truly legal question. His argument about the nature of the takings here is not that there was a physical invasion of his property, that's not what we're talking about, or that the regulation deprived him of all economically beneficial use of his property. He really is going off on the third and last possibility to it that this amounted to a partial regulatory taking governed by Penn Central and cases like that. You agree that that's the modality of analysis we should employ here? I agree. You should look at it under the heading of a partial regulatory taking? Yes, Your Honor, but the issue is that there is no property interest and the right to exclude others from the industry. So you'd never get to the Penn Central issues? Correct, Your Honor. The only limited property right that's ever been recognized is on the individual medallion. The right to exclude others from the industry was never and has never been a property right held by the plaintiffs. If you were to apply Penn Central factors the Supreme Court lays out there with some clarity, what would that yield here? I think, Your Honor— And more precisely, would it not cause you to vacate the dismissal and send it back for discovery? Your Honor— The Supreme Court says you'd look at the economic impact, one. Two, the extent to which the regulation has interfered with a distinct investment-backed expectation. That's the second. And third, you'd look at the character of the government action itself. If you were to apply that test to this case, what would it yield? Your Honor, the issue is— Does it yield a slam-dunk dismissal for failure to state a claim? Yes, Your Honor, the issue is— Tell me why. The issue is that the county has never protected, the county has never promised a value in these medallions. The only thing that the county has promised is the right to participate in the for-hire industry. And until today, there are taxicabs out there that are still participating in the taxicab industry. The county has never promised a return on their investment. And in fact, the majority of the plaintiffs in this case, the majority of the taxicabs, only paid an administrative fee back in 1998 when they were issued the medallions. And so there's really truly no expectation here on the value of the medallion. It's simply expectation to be able to operate a taxicab, which is still the case. Your Honor, if I may address briefly the equal protection claim. In this case, plaintiffs—the Seventh Circuit opinion in— Well, he hasn't really argued that in—he really let—he simply rested on what he claimed in his brief. So I don't really know that you have to address that. He didn't really want to argue that here. Then I would briefly close to say, Your Honors, holding otherwise in this case and finding that the plaintiffs have a protected property right and excluding others from the industry would really be against public policy and result in, in 20, 30, 40 years down the road, being limited to only taxicabs providing the transportation services in Miami-Dade County and across the country. And so the real interest that Miami-Dade County has is in providing reliant— to the residents and visitors of Miami-Dade County. And so for that, I rest on my briefs. Thank you very much. Thank you. Mr. Anderson, you've reserved the full three minutes. Thank you. Here is what the code provided before May 2016 when the T&E ordinance was passed. And this addresses a question that Judge Wilson posed. The code provided, quote, It shall be unlawful for any person to use, drive, operate any for hire motor vehicle upon the streets of Miami-Dade County without first obtaining a Miami-Dade County for hire license and maintaining it current and valid pursuant to the provision of this article. It's undisputed that in this context, a for hire license equals a medallion. So that was what the law stated at that time. Now, my opponent here, I think, made a couple of interesting concessions. When she was discussing the hypothetical of Judge Marcus regarding exponentially increasing the number of medallions, counsel stated that as long as the need for additional taxi cab service was there, that would justify increasing the number of medallions. That's our answer to the 300 medallions or the 16% addition of medallions since 1998. The population of Dade County, Miami-Dade County, obviously ballooned, and they added some taxi cab medallions, just like they're permitted to do under the code. But throughout that period of time, the value of taxi cab medallions increased. And it increased because of the relationship between the number of medallions and the population out there. So that is the explanation and our answer to that. Traditionally, the addition of medallions has been relatively de minimis and tied to the market. It all goes together. Also, Your Honors, I think it's important to note that the Penn Central three factors, which are reiterated in the Ruckelshaus case, are indeed necessary to determine whether there is, in fact, a protectable property interest. Counsel says or suggests that, no, those factors don't count in that analysis. Well, we disagree. Let me ask you this question this way. We really started with this. Is there any case anywhere, anytime, that has ever held that the right to property includes the right to be free from competition? Not in so many words. But the Ruckelshaus case, we believe, comes close. And that's the case that deals with exclusivity. And with that, I will close. Thank you very much. Thank you both for your efforts. We'll proceed to the third.